No. 26,253.

IRENE (JACKSON) STILLIE, a Minor, by JOHN F. JOHNSON, Her Guardian, *Appellee*, v. FRANK D. STILLIE et al., *Appellants*.

### OPINION ON REHEARING.

Appeal from Shawnee district court, division No. 2; OSCAR RAINES, judge *pro tem*. Opinion on rehearing filed April 10, 1926. Former opinion adhered to. (For original opinion of affirmance see 119 Kan. 816.)

*W. R. Hazen* and *Frank G. Drenning*, both of Topeka, for the appellants.

*James E. Larimer, Elisha Scott* and *W. E. Atchison*, all of Topeka, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: In this case an opinion was filed on December 5, 1925, and is reported in 119 Kan. 816. Later a rehearing was granted on the following propositions:

1. Did the court commit error in permitting Lena McDowell;

Appeal and Error, 3 C. J. pp. 855 n. 38, 856 n. 40. Bastards, 7 C. J. pp. 944 n. 60, 988 n. 63, 64; 2 L. R. A. n. s. 619; 36 L. R. A. n. s. 255; 3 R. C. L. 727-731. Trial, 38 Cyc. p. 1756 n. 1. Witnesses, 40 Cyc. p. 2222 n. 9.

the mother of the plaintiff, to testify concerning the paternity of the latter?

2. If the testimony of Lena McDowell, the mother of the plaintiff, was competent to prove the paternity of the latter, did the court commit error in not limiting the application of that evidence to the question of paternity?

3. Did the court commit error in admitting evidence of general reputation to prove the paternity of the plaintiff?

The object for which evidence is introduced in the trial of a cause is to ascertain the truth concerning the facts in issue. The common law rules of evidence have been developed for the purpose of accomplishing that object, not for the purpose of suppressing the truth. This conclusion is supported by 3 Blackstone, 367; 1 Greenleaf on Evidence, 16th ed., § 1; 1 Wigmore on Evidence, 2d ed., § 1, p. 4; and 1 Bouvier's Law Dict., p. 1091.

In 1 Blackstone's Commentaries, 457, the following language is used:

"As bastards may be born before the coverture or marriage state is begun, or after it is determined, so also children born during wedlock may in some circumstances be bastards. As if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, *extra quatuor maria*) for above nine months, so that no access to his wife can be presumed, her issue during that period shall be bastards. But, generally during the coverture, access of the husband shall be presumed, unless the contrary can be shown; which is such a negative as can only be proved by shewing him to be elsewhere; for the general rule is *præsumitur pro legitimatione.*"

In 2 Greenleaf on Evidence, 16th ed., section 151, it is said:

"The husband and wife are alike incompetent witnesses to prove the fact of nonaccess while they lived together. But they are competent to testify, in cases between third parties, as to the time of their own marriage, the time of the child's birth, the fact of access, and any other independent facts affecting the question of legitimacy."

In an exhaustive note to *Dennison v. Page,* 72 Am. Dec. 651, it is said:

"Although there is some conflict in the decisions, no doubt the weight of authority tends to firmly establish the rule that neither the husband nor the wife is competent . . . for the purpose of establishing the illegitimacy of their child or children."

In another exhaustive note on this subject to *Wallace v. Wallace,* 126 Am. St. Rep. 267, the writer says:

"Though the testimony of the husband or wife to the effect that the

Stillie v. Stillie.

child given birth to by the wife was illegitimate has been allowed in a few cases, the better rule appears to be that such testimony is incompetent if the husband and wife were living together when the child was begotten."

### In 3 R. C. L. 727, in discussing this rule, it is said:

"The severity of the *quattuor maria* rule led Lord Raymond to decide that the legal presumption of the husband's access might be controverted by other proof; and this opinion has been sanctioned by innumerable subsequent determinations. The authorities are not entirely in harmony with regard to the circumstances which will rebut the strong presumption of legitimacy arising from the birth of a child in wedlock. The rule generally obtaining, however, is the one first laid down by Lord Langsdale to the effect that the presumption may be wholly removed by proper and sufficient evidence showing that the husband was impotent; entirely absent, so as to have no intercourse or communication of any kind with the mother; entirely absent at the period during which the child must, in the course of nature, have been begotten; or present only under such circumstances as afford clear and satisfactory proof that there was no sexual intercourse."

### In 7 C. J. 944 it is said:

"As a rule the declarations or admissions of husband or wife concerning children born in wedlock are inadmissible to prove the illegitimacy of such children. Thus such admissions are not admissible to establish nonaccess of the husband, the showing of circumstances from which nonaccess may be inferred only being allowable. This does not mean that a spouse may not give testimony having a tendency to show the offspring to have been begotten by a third person."

### In 1 Rice on Evidence, 82, it is said:

"But where nonaccess has been established by evidence *aliunde,* the declaration of the mother is admissible to prove the paternity of the child."

### In a note to *Evans v. State, ex rel.,* 2 L. R. A., n. s., 619, the following statement is made: .

"At common law, a married woman has no right to testify to the nonaccess of her husband on the question of the bastardy or illegitimacy of her child. The reason for this, as stated in the phrase of Lord Mansfield, is based on decency, morality and public policy, and that neither husband nor wife should be allowed to bastardize a child of the wife by showing the nonaccess of the husband. The admission of such evidence is regarded as scandalous, not so much from the fact that it would reveal the immoral conduct of the mother, as because of the effect it may have on the unfortunate child, who is at no fault, but who must nevertheless be the chief sufferer."

### In 3 Rice on Evidence, page 858, section 546, it is said:

"The mother of the alleged bastard was a married woman, whose husband was living at the time of the alleged illicit intercourse and the birth of the child. And while she is, from the necessity of the case, a competent witness

to prove the illicit intercourse, and who is in fact the father of the child, she is not competent as a witness to establish the nonaccess of the husband; nor his absence from the state; nor any fact which may be proved by other testimony. This seems to be the well settled rule."

This writer cites the statement by Lord Mansfield.

These quotations from law writers show that married women have been permitted to so testify as to bastardize their children. The subject under consideration is discussed by John Henry Wigmore, than whom there is no greater writer on the law of evidence. In 4 Wigmore on Evidence, 2d ed., sections 2063 and 2064, pages 381-388, the history of the rule is given. He says:

"The story of the rule that parents may not 'bastardize their issue' is a singular one, though it has had some parallels in other parts of our law. First, a settled rule; then, a chance judicial expression, in apparent contradiction; then, a series of rulings based on a misunderstanding of this expression and an ignoring of the settled rule; then, an entirely new rule, and new and wondrous reasons contrived and put forward to defend the novelty, as if it had from the beginning been based on the experience and wisdom of generations.

"In the first place, then, there clearly was in the beginning no rule at all against using the testimony of a husband or a wife to prove the nonaccess of the husband as evidence of the child's bastardy." (p. 381.)

Wigmore then states that there arose a rule, peculiar to proceedings to charge a bastard's father with its support, which was that the order to support should not be made against the defendant on the sole and uncorroborated testimony of the mother, if a married woman. Then came the declaration by Lord Mansfield, which contained the following:

"As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule founded in decency, morality and policy, that they shall not be permitted to say after marriage that they have had no connection, and therefore that the offspring is spurious; more especially the mother, who is the offending party." (p. 383.)

In speaking of this declaration of Lord Mansfield, Wigmore says:

"What must be conceded and emphasized, however, is that he had no authority whatever for his utterance. If there is any such law of England, or was for any period, it was invented by him and dates from his utterance. Before long it began to be repeated with approval, and the way was paved for substituting his new law for the existing law." (p. 383.)

He further says:

"In the United States the original practice, so far as there is any report of it, was entirely in harmony with the orthodox rule of *R. v. Reading; i. e.*, it knew merely a rule of corroboration for married mothers in filiation or similar

Stillie v. Stillie.

proceedings. But the circulation of Lord Mansfield's dogmatic pronouncement, in the treatises of the early 1800's, soon brought the new rule to the attention of our courts; and they seem usually to have accepted it with unquestioned faith. It may have become, in some jurisdictions, too deeply planted to be uprooted." (p. 385.)

Wigmore concludes his discussion of the rule as follows:

"The truth is that these high-sounding 'decencies' and 'moralities' are mere pharisaical afterthoughts, invented to explain an otherwise incomprehensible rule, and having no support in the established facts and policies of our law. There never was any true precedent for the rule; and there is just as little reason of policy to maintain it." (p. 388.)

There was no error in the admission of the evidence of Lena McDowell. The other matters were sufficiently discussed in the former opinion, which is adhered to.

MASON, J. (concurring specially): I think the judgment should be affirmed upon these grounds: Assuming for the purposes of the case that the mother of a child born in wedlock but conceived prior thereto cannot testify to nonaccess, at the time of conception, of the man she later married, after the impossibility of access has been satisfactorily proved by other testimony she may tell who the father was. It was proper for the court, after the introduction of independent evidence which if true proved the child not to be that of the mother's husband, to allow the mother to say who the father was, and send both questions to the jury at once. Whether the evidence of other witnesses was sufficient to establish the illegitimacy of the child, although more than a mere preponderance was required on that issue, and whatever the test may have been in that regard, was a matter for the final determination of the jury and trial judge. (*Wooddell v. Allbrecht,* 80 Kan. 736, 104 Pac. 559; *Taylor v. Holyfield,* 104 Kan. 587, 180 Pac. 208.) Complaint cannot be made now of the omission of the trial court to limit the scope of the wife's testimony by instructing it was to be considered only in case illegitimacy had been satisfactorily established by the other witnesses, because such an instruction was not requested. (*Sweet v. Savings Bank,* 73 Kan. 47, 84 Pac. 542; *State v. Marsee,* 93 Kan. 600, 602, 144 Pac. 833; 3 C. J. 855-856.)

It may be worth while to mention that Lord Mansfield's much quoted opinion was pronounced in support of a decision granting a new trial because he held error had been committed by the trial

court in refusing to admit in evidence a statement of a mother which showed that her child was illegitimate and which was offered for that purpose.

JOHNSTON, C. J., BURCH and HARVEY, JJ., dissenting.