*In re* WRIGHT'S ESTATE.

1. EVIDENCE—TESTIMONY AS TO STATEMENTS OF MOTHER ON PATER-NITY OF SON ADMISSIBLE ON QUESTION OF PEDIGREE.

In proceedings to determine the heirs of intestate, testimony as to statements of deceased mother that plaintiff, her son, though born six months after her marriage with her first husband, was in fact the son of intestate, to whom she was married after divorce from her first husband, was improperly rejected, being admissible in evidence on the question of pedigree.

2. WITNESSES—HUSBAND MAY NOT TESTIFY AS TO NONACCESS.

Testimony of the first husband of plaintiff's mother as to nonaccess or tending to establish it and that plaintiff, though born in wedlock, was not his son but the son of intestate, whom the mother married after divorce from witness, was properly rejected. BIRD, STEERE, and McDONALD, JJ., dissenting.

¹Evidence, 22 C. J. § 227; ²Witnesses, 40 Cyc. p. 2222.

Error to Kent; Dunham (Major L.), J.   Submitted January 15, 1926.   (Docket No. 15.)   Decided January 3, 1927.

Petition in the probate court by Lloyd D. Wright for a partial distribution of the estate of Edwin G. Wright, deceased, and a determination of the heirs of said estate.   From an order granting the petition, Mary Campau and others appealed to the circuit court. Judgment for contestants, plaintiff brings error.   Reversed.

*Jewell, Face & Messinger*, for appellant.

*Linsey, Shivel & Smedley*, for appellees.

BIRD, J.   Edwin G. Wright was a long-time resident of Grand Rapids.   He died intestate in that city in December, 1922, leaving an estate of about $10,000. He left him surviving the petitioner, Lloyd Dell Wright, who claims to be a son, a half-sister, and children of two deceased half-sisters, who are the contestants in this proceeding.   Lloyd D. Wright filed a petition in probate court praying for a partial distribution of the estate and for a determination of the heirs of the estate.   In his petition he claims he is a son and sole heir of Edwin G. Wright.   This is denied by contestants, and this presents the sole issue in this proceeding.

It appears that Edwin G. Wright and Anna Watts lived in the same locality when they were children. They grew up together and were much in each other's company.   As they grew to maturity they became fond of each other and would, doubtless, have married except for the opposition of the mother of Anna Watts. Anna Watts finally married Adelbert Raby in February, 1892, and within six months thereafter Mrs. Raby gave birth to a fully-developed boy, who is now Lloyd Dell Wright, the petitioner.   Mr. Raby con-

tinued to live with Mrs. Raby for a time and furnished the necessities of life, but he never acknowleged the boy as his own. Later he filed his bill for divorce and it was granted on the ground of extreme cruelty. Mrs. Raby made no defense. Mr. Raby did not pray for the custody of the boy and he was left with his mother. The decree contained no provision for the support of the boy nor for alimony.

Soon after the decree was granted Edwin G. Wright renewed his attentions to Mrs. Raby. Mrs. Raby's mother, who had previously opposed her marriage to Wright, was then deceased. The marriage of Mrs. Raby and Edwin G. Wright followed and the petitioner was taken into the home, supported and acknowledged by Wright to be his son. He gave him his name, spoke of him as his boy, his son. He treated the boy as his son, was often in his company, and appeared to be as fond of him as one would of an own son. Mrs. Wright died in 1912, and after this Mr. Wright and Lloyd continued to live in the old home. In later years Lloyd went to New York City, where he now resides.

At the hearing in the probate court the petitioner was successful and was declared to be the son and only heir of Edwin G. Wright. Upon appeal in the circuit court, the petitioner offered evidence of several women, who had been intimate friends of his mother, to the effect that Mrs. Wright had disclosed to them that Mr. Wright was the father of petitioner, and that she did not love Raby and never would have married him had she not been induced to by her parents. This testimony was objected to and excluded. The testimony of Mr. Raby, the former husband of Mrs. Wright, was offered to the effect that the child was not his; that after the child was born it was a matter of continual dispute between him and his wife as to who was the father of the child; and that she finally admitted to him that Wright was the father of the child. That

after this admission he left them and never returned, and that no demand was ever made upon him to support the child.    This testimony was likewise re-jected.

The question presented to us is :    Were these declarations of Mrs. Wright and the testimony of Mr. Raby admissible on the issue, whether petitioner was a son of Mr. Wright?

It was contended by defendants that the testimony of Mr. Raby and the admissions of Mrs. Wright were inadmissible, by reason of the rule that neither husband nor wife will be permitted, as a witness, to bastardize the issue of the wife after marriage by testifying to the nonaccess of the husband.    The trial court adopted this view and refused to receive the evidence.

The plaintiff recognizes this rule, but argues that it is not applicable to this case because whichever way the jury may decide it will not bastardize the issue. If the jury should find Mr. Raby was the father of petitioner he will not be declared a bastard, because he was born in lawful wedlock.    *People* v. *Case*, 171 Mich. 282.    Should the jury find that Mr. Wright was the father of the petitioner it will not bastardize the petitioner, because of the statute which provides that if the father shall intermarry with the mother after the birth of the child the child shall be considered legitimate for all intents and purposes (3 Comp. Laws 1915, § 11798).    So, whichever way the jury decides the issue, it will not result in bastardizing the petitioner.

The declarations of Mrs. Wright that Mr. Wright was the father of petitioner are probably admissible under the exception to the rule of hearsay when it involves a question of pedigree.    This rule is an old one and has been recognized by this court in *Kotzke* v. *Kotzke's Estate*, 205 Mich. 184; *Livernash* v. *DeLorme,*

208 Mich. 295.    But the question raised to the admission of Mr. Raby's testimony is subject to more doubt.

This court, at an early date, adopted the Lord Mansfield rule that neither husband nor wife will be permitted, as a witness, to bastardize the issue of the wife after marriage by testifying to the nonaccess of the husband.    *Egbert* v. *Greenwalt*, 44 Mich. 245 (38 Am. Rep. 260) ; *People* v. *Case*, 171 Mich. 282. But it was held that this fact might be shown by other evidence.    *Id.*   As counsel are in accord as to the existence of this rule in this State, it will be unnecessary to comment further as to its existence.

Plaintiff's contention raises the question as to the reasons for promulgating the rule.    Law writers and the courts have given different reasons for the rule. The case in which the rule was first promulgated was an ejectment case.    The question of the legitimacy of some of the parties was raised, and Lord Mansfield said:

"As to the time of the birth, the father and mother are the most proper witnesses to prove it.    But it is a rule, founded in decency, morality, and policy, that they shall not be permitted to say, after marriage, that they have had no connection, and therefore that the offspring is spurious."    *Goodright* v. *Moss*, 2 Cowp. 591.

The Kansas supreme court, in a recent opinion, considers the question involved here.    *Lynch* v. *Rosenberger*, 121 Kan. (A. S.) 601 (249 Pac. 682).

Dean Wigmore, in his work on Evidence, attacks this rule with much spirit, and especially the reasons assigned in support of it.    As to the reasons he says, in part:

"The rule, then, as an independent one, standing by itself, *must be based upon some extrinsic ground of 'decency, morality, and policy' in Lord Mansfield's phrase.    But why is such a person's testimony to such a fact indecent, immoral, or impolitic?    Among several*

*judicial efforts to supply an answer to this question, the following may be taken as typical:*

"1874, Gordon, J., in *Tioga County* v. *South Creek Township*, 75 Pa. 433, 437:

" 'Many reasons have been given for this rule. Prominent among them is the idea that the admission of such testimony would be unseemly and scandalous; and this, not so much from the fact that it reveals immoral conduct upon the part of the parents, as because of the effect it may have upon the child, who is in no fault, but who must nevertheless be the chief sufferer thereby. That the parents should be permitted to bastardize the child is a proposition which shocks our sense of right and decency.'

"We learn, then, that the indecency or unseemliness lies in allowing a person to testify to an illicit connection, and the immorality consists in allowing a parent to give testimony which will ruin his own child's legal status. The utterly artificial and false nature of the rule could not more forcibly appear than in the inconsistency of these *ex post facto* reasons. (1) There is an indecency, we are told. And yet, in nine cases out of ten, the sole question that the wife is asked is (for example) whether her husband was in St. Louis from 1849 to 1853 during the time that she was in New York. Is this indecent? Moreover, the very next question may be whether during that time she lived with the alleged adulterer; and this (by general concession) is indubitably allowable. In every sort of action whatever, a wife may testify to adultery or a single woman to illicit intercourse; yet the one fact singled out as 'indecent' is the fact of nonaccess on the part of a husband. Such an inconsistency is obviously untenable. (2) There is an immorality and a scandal, we are told, in allowing married parents to bastardize their children. And yet they may lawfully commit this same immorality by any sort of testimony whatever, except to the fact of nonaccess. They may testify that there was no marriage ceremony, or that the child was born before marriage, or that the one party was already married to a third person, or their hearsay declarations (after death) to illegitimacy in general may be used. In all these other ways they may lawfully do the mean act of helping to

bastardize their own children born after marriage. Where is the consistency here? Of what value is this conjuring phrase about 'bastardizing the issue,' if it will not do the trick more than once in a dozen times. Moreover, what shall be said of a system of law which, while thus rebuking parents who come to prove their children bastards, at the same time by its own inhuman prohibition (unique among civilized peoples) has refused absolutely to allow those parents, by any means whatever, to remove afterwards (by legitimation) the consequences of their original error and to give to their innocent children the sanction of lawful birth,—a refusal which is still maintained in most of our jurisdictions? That the same law which harshly fixes the stain of bastardy as perpetually indelible should censure parents for the abomination of testifying to that bastardy is preposterous.

*"The truth is that these high-sounding 'decencies' and 'moralities' are mere pharisaical afterthoughts, invented to explain an otherwise incomprehensible rule, and having no support in the established facts and policies of our law. There never was any true precedent for the rule; and there is just as little reason of policy to maintain it."* 4 Wigmore on Evidence (2d Ed.), § 2064.

While we think there is much good sense in his opposition to the reasons for the rule, we think the rule a good one on the ground of public policy. The Mansfield rule, undoubtedly, lessens the number of public charges which would have to be cared for and supported by the public. It works for the peace and quiet of the family. It works for the peace of the community and society generally. And the State has passed legislation which has advanced and supported these reasons, all of which, we apprehend, may be construed as showing a public policy.

In reviewing the many reasons given for the rule by its author, text-book writers and courts, we think the prime reason for the rule is as stated—that it is against public policy to permit parents to give testimony bastardizing their issue. With this view, we

can see no reason why the testimony of Mr. Raby and the declaration of Mrs. Wright are not admissible, because, in either event, as counsel suggest, the petitioner would not be bastardized.    Whether the testimony of either parent, if believed, will result in bastardizing the issue ought to be the test.    If it does not, the testimony should be admitted.    If it does, it should be rejected.

Having reached this conclusion, the case must be reversed and a new trial granted.    Plaintiff should recover his costs in this court.

STEERE and McDONALD, JJ., concurred with BIRD, J.

FELLOWS, J.    I agree with Justice BIRD that the case must be reversed for the exclusion of statements made by the deceased mother of petitioner during her lifetime, which were admissible on the question of pedigree.    The testimony of Mr. Raby as to nonaccess or as to facts tending to establish nonaccess was properly rejected.    See *Yanoff* v. *Yanoff, post,* 383, and authorities there cited.

SHARPE, C. J., and SNOW, WIEST, and CLARK, JJ., concurred with FELLOWS, J.