## Commonwealth v. Stumbaugh

*LeRoy S. Maxwell*, District Attorney, and *Daniel W. Long*, for Commonwealth.

*George S. Black*, for defendant.

WINGERD, P. J., January 10, 1947.—This is a prosecution brought for nonsupport of a child under the Act of June 24, 1939, P. L. 872, sec. 373, 18 PS §4733.

Prosecutrix and defendant were married July 6, 1940, and lived together until October 31, 1942, at which time they separated. A child was born to prosecutrix March 31, 1943. In 1944 defendant obtained a divorce from prosecutrix and remarried a few days after the divorce was granted. The child received an allotment while defendant was in the Army, he having entered the Army after being divorced. Defendant testified he didn't know such an allotment was being paid. Prosecutrix testified that defendant was the father of the child. Defendant contended that he was not liable for the support of the child as he was not its father. It was uncontradicted that he and prosecutrix were living together as man and wife when the child was conceived but the fatherhood of defendant was denied on the ground that he is and was since 1934 sterile because of an attack of mumps—parotitis—which involved both testicles. It clearly appeared in the case that his alleged impotence, lack of power of procreation, consisted of sterility and did not in any way involve lack of the power of coitus. In fact, it was clearly shown that as late as September 1946 he had the power of coitus.

Defendant testified, under objection (ruling thereon being reserved), that he had been ill with the mumps in 1934; that both of his testicles were involved in such illness; that on September 24, 1946, he obtained a sample of his semen and conveyed it to a physician in the manner in which the physician had instructed him; and that he had never had any disease affecting his private parts other than the one mentioned. The objection to his testimony was made on the ground that its effect was to bastardize the child born while he and prosecutrix were man and wife. His evidence is important because the physician who attended him in 1934 is dead. He was the only person who testified that he had no illness other than the mumps in 1934, which affected

his testicles, and that the semen given the physician, Dr. Pantalone, and examined by the technician, was his semen.

In Pennsylvania the rule seems clear that neither parent can testify as to nonaccess in a proceeding in which the legitimacy of a child, born during lawful wedlock, is at issue. However, it is not fully clear that a parent is incompetent to testify to facts which may bastardize the child, as long as such facts do not prove or tend to prove nonaccess. When the contention of illegitimacy is based, not upon nonaccess, but upon the ground of impotency or invalidity of marriage, etc., there seems to be considerable authority that a parent is not incompetent to testify, although his or her testimony may tend to bastardize the child.

In Wigmore on Evidence, 3rd ed., §2063, p. 367, the author states, in reference to the testimony of the husband or wife concerning a child born during their wedlock: "It is agreed, however, on all hands that the prohibited testimony concerns solely the specific fact of nonaccess, i. e., testimony to any other fact constituting illegitimacy, or to illegitimacy in general, is admissible."

In Janes's Estate, 147 Pa. 527, on page 530, we find:

"A presumption of legitimacy attaches to birth in wedlock, and it cannot be rebutted by the testimony of the mother or of her husband. It may be overcome by proof of non-access of the husband, but they are not competent to establish it. The proof must come from another source. But the mother is competent to prove the fact and time of her marriage, and when her child was born. . . . In Taylor on Ev. 817, the learned author, referring to the same subject, says: 'But this rule does not prevent the parents from proving that the supposed marriage was either invalid or valid, or that their children were born before or after its celebration, though the effect of such evidence is, in the

first and third case, to bastardize the issue, and in the others to establish its legitimacy. For this purpose, too, their declarations, or their old answers in chancery, are admissible evidence.' An examination of the decisions on the point under consideration discloses the fact that they are in entire accord with the rule as above stated."

In Commonwealth ex rel. Moska v. Moska, 107 Pa. Superior Ct. 72, on page 75, decided in 1932, Baldrige, J., now president judge, states:

"What seems to be a reasonable view is taken in Wright's Estate, 237 Mich. 275 [*sic*], 211 N. W. 246 [*sic*], wherein it was held that if the testimony of either parent, if believed, would result in bastardizing the child, it ought to be excluded; if not, the testimony should be admitted."

Janes's Estate, supra, seems to indicate rather clearly that a husband or wife may testify to matters which tend to bastardize a child born during wedlock, other than nonaccess, and is partly in accord with the conclusion of Professor Wigmore that the prohibition which we are considering applies only to nonaccess. The statement quoted from the Moska case, supra, we feel must be interpreted in relation to the facts of that case and the matter which the court was considering. The court there was considering only the question of access or nonaccess and the particular matter being considered in reference to which the above quotation was made, was whether or not the wife could testify to access. However, in In re Wright's Estate, 237 Mich. 375, 211 N. W. 746, from which the quotation was taken, the opinion deals largely with the rule laid down by Lord Mansfield, in Goodright v. Moss, 1 Cowp. 591, 98 Eng. Rep. 1257, which, although generally interpreted as applying to nonaccess, seems to be much broader and to apply to any testimony of husband or wife, the purpose of which is to bastardize a child

when there is no question that it was born during lawful wedlock.

The matter is not at all clear but it seems that testimony of a husband as to matters which may be steps in or have some relation to the proof that a child is illegitimate are not necessarily inadmissible. For instance, in the present case, the testimony of the husband that he had a certain disease at a certain time, which affected his private parts; that he had no other disease affecting such parts; and that on a certain day he took a sample of his semen to the doctor, should be admissible to show those facts. None of them in itself shows that the child is illegitimate. They do not tend to prove illegitimacy to the extent that testimony, showing the marriage to have been invalid, does, which was approved as admissible by our Supreme Court in Janes's Estate, supra. It is our feeling that the testimony of the husband in the present case should be admitted. Its admission may be doubtful but we resolve the doubt in favor of its admission. However, we do not go so far as to hold that testimony of a husband that he was impotent at the time the child was conceived is admissible.

With the testimony of defendant in the case, we must decide whether or not, under all the evidence, a finding of fact can be properly made that defendant was sterile at the time the child was conceived. In considering this matter, we have little help from appellate decisions but we do have the following statements: In Commonwealth v. Shepherd, 6 Binney, 283, 286, the court states: "When the husband has access to his wife, it is right that no evidence, short of absolute impotence of the husband, should bastardize the issue", and in the Moska case, supra, the Superior Court says, on page 76: "In Patterson v. Gaines, 6 How. 550, Mr. Justice Wayne said: 'Once the marriage is proved, nothing shall be allowed to impugn the legitimacy of

the issue short of proof of facts showing it to be impossible that the husband can be the father.'" The word "impotence" includes sterility. The definition given in Webster's New International Dictionary of the word "impotence", as used in law and medicine, is "absence of procreative power". It may mean absence of the power of coitus also but a person may be impotent and yet have the power of coitus. Strictly speaking, impotence means, as we have stated, absence of the power of procreation, which may be by reason of sterility or lack of the power of coitus, or both.

The two cases above referred to, the Shepherd case and the Moska case, clearly show that a very heavy burden is upon defendant to show his incapability of being a father at the time the child was conceived. Has he met that burden? The testimony is that he had mumps—parotitis—in 1934. He states both testicles were involved and his mother states both were swollen. The physician who attended him at that time is dead so we have no definite testimony as to what was the severity of the disease or its extent. We have the testimony of the physician, Dr. Pantalone, that he is now sterile, based on a physical examination, which disclosed that both of his testicles are atrophied, and an examination of his semen. The condition of his testicles must not of itself be conclusive proof, even of present sterility, for the physician thought it necessary to have a sample of his semen miscroscopically examined. The semen, when microscopically examined, showed some spermatozoa which were inert. No explanation or comment was made in regard to this condition of the spermatozoa by either the physician or the technician. No evidence was given as to the time which elapsed between the time the semen was delivered to the doctor, around 9:30 or 10 o'clock a.m. on September 24, 1946, and the time the semen was examined by the technician. Nothing was shown as to the cause of the inertness of the spermatozoa or that normal spermatozoa

would not become inert in a certain time after ejaculation, etc., either by expert opinion or otherwise. Defendant testified that he had taken the semen promptly to the physician after ejaculation and described how he had conveyed it in accordance with the doctor's instructions, but how and when it got from the doctor to the technician, as we have said, was not disclosed.

The testimony of the physician was very indefinite and inconclusive as to defendant's condition at the time the child was conceived. In the physician's testimony, we find the following:

"By Mr. Black:

"Q. Now, doctor, from your examination of the patient, you say you determine he was sterile? A. Yes sir.

"Q. Now, is there anything on which you can form an opinion as to how long that condition of sterility had lasted? A. No you can't say definitely how long a period it could have been but from the history, as in this case, he had parotitis, affecting both testicles. From the history of this parotitis, it is possible to become sterile, due to the fact of the atrophy of the testicles."

"By Mr. Black:

"Q. What is your opinion, based upon the knowledge of the patient and examination of the case history, as to the length of time of the sterility? A. It is hard to tell the length of time of the sterility, except from our knowledge of these conditions: He had parotitis 12 years ago, which indicates that he was sterile from that time, but to show scientifically it can't be done.

"Q. Did you yourself take the specimen of defendant's semen from your patient and analyze it? A. Yes sir.

"Q. Who gave you that specimen? A. Mr. Stumbaugh.

"Q. And you have that report with you? A. No I don't. That was given to me orally. I didn't know it was going to be a court case.

CROSS-EXAMINATION

"By Mr. Long:

"Q. Doctor, isn't it a fact that mumps do not always cause sterility?

"A. Well, if you get it just in one side, it is possible. If you get bilateral atrophy of glands, you are sterile.

"Q. You made no examination? A. I did and in my opinion I believe this boy . . .

"Q. Just a minute, I didn't ask your opinion, no further questions.

"By Mr. Black:

"Q. You say you did make an examination of this boy to determine whether atrophy?

"A. In my opinion, atrophy of both testicles.

"Q. What were you going to say as your opinion? A. Just that I examined the patient, he is my patient and I examined him. Atrophy of both testicles. All this was prior to my knowledge that it was going to be a court case. He came in as a private patient."

It will be noticed that the physician testifies that he cannot say definitely how long sterility had existed in the present case. He says it is *possible* to become sterile from mumps—parotitis—due to the atrophy of the testicles. He further says that now the testicles are atrophied but does not give a definite opinion of how long that condition and the ensuing sterility existed. He uses such words as "possible" and "indicates". He also says "If you get bilateral atrophy of glands, you are sterile", but does not indicate that such condition always follows mumps involving both testicles, nor does he indicate when, in reference to the time of having the disease, such condition develops. He clearly implies that the disease itself does not cause sterility but if, by reason of the disease, atrophy of the glands

follows, sterility takes place. "Atrophy" we find in Webster's New International Dictionary is "a wasting away from want of nourishment; diminution in bulk or slow emaciation of the body or of any part". It is not a condition which happens instantaneously or quickly. If the present atrophy of defendant's testicles was caused by mumps, we do not know when it had progressed to such an extent as to cause sterility. With the presence of spermatozoa in September 1946, who can say that defendant was sterile in June or July 1942, the child having been born on March 31, 1943, regardless of the opinion of the effectiveness or virility of the spermatozoa at this time. There is nothing, not even a definite opinion of a physician, upon which to base a finding that defendant was sterile in June or July 1942.

As there was access at the time of the child's conception and both the conception and birth took place during lawful wedlock and defendant has failed to prove that he was absolutely impotent—sterile—at the time of conception, he is responsible for the support of the child.

Now, January 10, 1947, defendant, Robert Earl Stumbaugh, is ordered to appear before this court on January 24, 1947, at 9:30 a.m., at which time this court will make an order, in accordance with the foregoing opinion.

### Order

And now, January 24, 1947, the court sentences defendant, Robert Earl Stumbaugh, to pay the costs of prosecution, and pay Elinor J. Stumbaugh the sum of $75 on Saturday, January 25, 1947, and pay to Elinor J. Stumbaugh the sum of $5 on each and every Saturday thereafter until further order of the court, for the support of his child, Robert Eugene Stumbaugh, and enter into his own recognizance in the sum of $500 for the faithful compliance with this order and be in the custody of the sheriff until sentence is complied with.