Lynch v. Rosenberger.

No. 26,592.

MARION LYNCH, *Appellee*, v. HARRIETT ROSENBERGER et al., *Appellees*, and JACOB RAY LYNCH, *Appellant*.

SYLLABUS BY THE COURT.

1. BASTARDS—*Evidence of Paternity—Testimony of Mother as to Nonaccess of Husband.* In an action for partition, where an issuable fact was the paternity of one of the claimants, the evidence of the mother was competent to prove nonaccess of her husband.

2. SAME—*Evidence of Paternity—Mother's Testimony Admissible.* And, further, where the evidence of the mother, considered in connection with other evidence, showed conclusively that the husband was not the father of the claimant, it was error to refuse consideration of the mother's evidence.

Appeal from Sumner district court; OLIVER P. FULLER, judge. Opinion filed October 9, 1926. Reversed.

*D. N. Caldwell, James Lawrence* and *J. S. Dey,* all of Wellington, for the appellant.

*E. J. Taggart* and *John Bradley,* both of Wellington, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The action was one for partition. The defendant, Jacob Ray Lynch, claimed the whole of the estate of Jacob Lynch, deceased, as his illegitimate son. He was defeated and appeals.

The facts are told by the court's findings which are, substantially, as follows: Jacob Lynch, a resident of Sumner county, single, never having been married, died intestate November 7, 1922, owning certain land in Sumner county. The plaintiff and the defendants, except the defendant Jacob Ray Lynch, are sisters, nephews and nieces of Jacob Lynch, and are the owners of the property by the law of descents and distribution, unless it is found that Jacob Ray Lynch is the son of Jacob Lynch.

For some time prior to November 4, 1893, Gallantine Kinder and Lizena Kinder were husband and wife, and residents of Oklahoma. On November 4, 1893, Lizena Kinder brought an action in the probate court of Canadian county, Oklahoma, to obtain a divorce from Gallantine Kinder. And on December 24, 1893, the probate court of Canadian county entered a decree of divorce granting to Lizena Kinder a divorce from Gallantine Kinder.

Bastards, 7 C. J. p. 945 n. 79; 2 L. R. A. n. s. 619; L. R. A. 1916B, 1053; 3 R. C. L. 732.  Evidence, 22 C. J. pp. 65 n. 9, 974 n. 59.  Witnesses, 40 Cyc. p. 2222 n. 4.

Prior to August 14, 1893, probate courts in Oklahoma were vested by statute with jurisdiction in divorce cases, but on August 14, 1893, the legislature of Oklahoma deprived probate courts of jurisdiction in divorce proceedings and vested exclusive jurisdiction thereof in the district courts of Oklahoma. At the time of the filing of the petition by Lizena Kinder, the probate courts had no jurisdiction in divorce proceedings. And in 1894 the supreme court of Oklahoma decided that all divorces granted by the probate courts of Oklahoma after August 14, 1893, were void. Afterwards, in 1895, the legislature of Oklahoma passed an act declaring that all decrees of divorce granted by the probate courts prior to the passage of such act valid, binding and effectual.

After the divorce proceedings in Oklahoma, Lizena Kinder moved to Missouri, and Gallantine Kinder came to Kansas and went to work for Jacob Lynch. In June, 1895, he sent for his former, or then, present wife, and had her remove from Missouri to the Lynch farm, where she and Gallantine Kinder again assumed the marriage relation, going together for a short time with a threshing outfit, and after a few weeks both returned to the Jacob Lynch farm, where she did the house work and Kinder was employed by Lynch. They lived together at the Lynch place as husband and wife continuously until the latter part of 1898.

The claimant, Jacob Ray Lynch, was born on December 1, 1899, and there is evidence tending to show nonaccess between Gallantine Kinder and Lizena Kinder after January, 1899, until after the birth of the claimant. Such evidence tending to prove nonaccess of Gallantine Kinder does not satisfactorily or conclusively show nonaccess without including in such testimony the evidence offered by the witness Lizena Kinder.

"If the testimony of Lizena Kinder is to be considered in connection with the other testimony showing nonaccess, then it does satisfactorily and conclusively show that Gallantine Kinder is not the father of the claimant Jacob Ray Lynch. . . . Jacob Lynch prior to his death generally and notoriously recognized the claimant, Jacob Ray Lynch, as his son, by oral declarations publicly made."

Just where Gallantine Kinder was living for something like a year after the birth of the claimant does not clearly appear from any evidence, but the evidence does clearly show that in 1901 he and Lizena Kinder, with her then three children, moved from the Lynch place to another farm in Sumner county, known as the Doctor Spitler farm, resided there for a short time, then afterwards moved to a farm known as the Adrian Logan place, resided there a short time,

just how long on either of the farms the evidence does not show; afterwards returned; to the Jacob Lynch farm, and that they all remained on the Jacob Lynch farm until about the year 1906. In the year 1906 Gallantine Kinder left the Lynch farm and Lizena Kinder and the three children remained there until 1911, when they removed to Oklahoma, and that Gallantine Kinder lived with his family in Oklahoma, and died there about 1920.

The court concluded that Gallantine Kinder and Lizena Kinder were never divorced, and at the time the claimant, Jacob Ray Lynch, was begotten they were husband and wife; that the evidence of Lizena Kinder tending to prove nonaccess by her husband, at the time the claimant was begotten, was incompetent and should not be considered, and that the plaintiff and the defendants, excluding defendant Jacob Ray Lynch, were entitled to have the property in controversy partitioned according as their several interests appear.

The appellant argues that there was a divorce in fact between his mother, Lizena Kinder, and Gallantine Kinder that ended their family life; that they lived apart and understood that their family life was ended, and that whether the divorce was valid or not, it destroyed the family and all the presumptions that have their source in the family life.

We think it unnecessary to consider whether or not the Oklahoma divorce in question was valid, or whether the matrimonial status of Gallantine and Lizena as husband and wife was renewed by their voluntary act of again living together. The trial court concluded from the evidence that, "If the testimony of Lizena Kinder is to be considered in connection with the other testimony showing nonaccess, then it does satisfactorily and conclusively show that Gallantine Kinder is not the father of the claimant Jacob Ray Lynch," and that "Jacob Lynch, prior to his death, generally and notoriously recognized the claimant, Jacob Ray Lynch, as his son, by oral declarations publicly made."

The finding of the trial court establishes beyond question that Jacob Lynch was the father of the appellant, Jacob Ray Lynch, and that Gallantine Kinder was not. But following the Lord Mansfield rule, which has been approved and followed in many cases, the trial court determined that the evidence of the mother, which conclusively demonstrated the truth, was incompetent and could not be considered. Was it proper to exclude that evidence which, better than any other, demonstrated the truth of the proposition in issue? The ultimate fact in issue—the one controlling fact to be ascertained

—was whether Jacob Ray Lynch was the son of Jacob Lynch. The action had been instituted, pleadings framed, trial had and evidence heard—all to ascertain the one ultimate controlling issuable fact. The means sanctioned by law for ascertaining in a judicial proceeding the truth respecting the question had been followed. The evidence, if considered, was controlling.

" 'The rules of evidence,' says a discriminating writer, 'are the maxims which the sagacity and experience of ages have established, as the best means of discriminating truth from error.' (Wills Cir. Ev. 2.)" (1 Bouv. 1091.)

"Evidence signifies that which demonstrates, makes clear or ascertains the truth of the very fact or point in issue, either on the one side or the other." (3 Blackstone's Commentaries, 367.)

"Evidence is 'relevant' when it touches upon the issues which the parties have made by their pleadings, so as to assist in getting at the truth of the facts disputed. . . . Evidence offered in a cause, or a question propounded, is 'material' when it is relevant and goes to the substantial matters in dispute, or has a legitimate and effective influence or bearing on the decision of the case." (22 C. J. 65.)

"The best evidence rule—one which from early times has been repeatedly enunciated by the courts—is that the highest degree of proof of which the case, from its nature, is susceptible must, if accessible, be produced." (22 C. J. 974.)

"The best obtainable evidence should be adduced to prove every disputed fact." (10 R. C. L. 903.)

In the recent case of *Stillie v. Stillie*, 120 Kan. 565, 244 Pac. 844, where paternity was in issue, it was said in the opinion:

"The object for which evidence is introduced in the trial of a cause is to ascertain the truth concerning the facts in issue. The common law rules of evidence have been developed for the purpose of accomplishing that object, not for the purpose of suppressing the truth. This conclusion is supported by 3 Blackstone, 367; 1 Greenleaf on Evidence, 16th ed., § 1; 1 Wigmore on Evidence, 2d ed., § 1, p. 4; and Bouvier's Law Dict., p. 1091." (p. 566.)

Dean John H. Wigmore, who perhaps has investigated the subject more than any other law writer, and has given it his usual careful consideration, says:

"The story of the rule that parents may not 'bastardize their issue' is a singular one; though it has had some parallels in other parts of our law. First, a settled rule, then, a chance judicial expression, in apparent contradiction; then, a series of rulings based on a misunderstanding of this expression and an ignoring of the settled rule; then, an entirely new rule, and new and wondrous reasons contrived and put forward to defend the novelty, as if it had from the beginning been based on the experience and wisdom of generations. In the first place, then, there clearly was in the beginning no rule at all against using the testimony of a husband or a wife to prove the nonaccess of the husband as evidence of the child's bastardy.

Lynch v. Rosenberger.

"The rule, then, as an independent one, standing by itself, must be based upon some extrinsic ground of 'decency, morality, and policy,' in Lord Mansfield's phrase. But why is such a person's testimony to such a fact indecent, immoral or impolitic? . . . We learn, then, that the indecency or unseemliness lies in allowing a person to testify to an illicit connection, and that the immorality consists in allowing a parent to give testimony which will ruin his own child's legal status. The utterly artificial and false nature of the rule could not more forcibly appear than in the inconsistency of these 'ex post facto' reasons. (1) There is an indecency, we are told. And yet, in nine cases out of ten, the sole question that the wife is asked is (for example) whether her husband was in St. Louis from 1849 to 1853 during the time that she was in New York. Is this indecent? Moreover, the very next question may be whether during that time she lived with the alleged adulterer; and this (by general concession) is indubitably allowable. In every sort of action whatever, a wife may testify to adultery or a single woman to illicit intercourse; yet the one fact singled out as 'indecent' is the fact of nonaccess on the part of a husband. Such an inconsistency is obviously untenable. (2) There is an immorality and a scandal, we are told, in allowing married parents to bastardize their children. And yet they may lawfully commit this same immorality by any sort of testimony whatever, except to the fact of nonaccess. They may testify that there was no marriage ceremony, or that the child was born before marriage, or that the one party was already married to a third person, or their hearsay declaration (after death) to illegitimacy in general may be used. In all these other ways they may lawfully do the mean act of helping to bastardize their own children born after marriage. Where is the consistency here? Of what value is this conjuring phrase about 'bastardizing the issue,' if it will not do the trick more than once in a dozen times? Moreover, what shall be said of a system of law which, while thus rebuking parents who come to prove their children bastards, at the same time by its own inhuman prohibition (unique among civilized peoples) has refused absolutely to allow those parents, by any means whatever, to remove afterwards (by legitimation) the consequences of their original error and to give to their innocent children the sanction of lawful birth—a refusal which is still maintained in most of our jurisdictions? That the same law which harshly fixes the stain of bastardy as perpetually indelible should censure parents for the abomination of testifying to that bastardy is preposterous." (4 Wigmore on Evidence, 2d ed., § 2063, p. 381, § 2064, pp. 387, 388.)

The facts in the instant case emphasize the unsoundness of the Lord Mansfield rule. Appellant's mother lived at the home of Jacob Lynch. A child was born to her. Jacob Lynch recognized it as his. It was named for its father. It grew to manhood. In the course of the years the father died, leaving an estate which was sought by his sisters, nephews and nieces. In order to substantiate their claims it was shown that appellant's mother had been the wife of Gallentine Kinder, and that, although Gallentine Kinder and the mother, Lizena Kinder, had been divorced, that the divorce proceedings were ineffective. Being ineffective, the Lord Mansfield rule was invoked to

prevent the mother from testifying that Gallentine Kinder was absent during the year 1899. While the mother's evidence was the best, and was found by the trial court to be conclusive, it was excluded from consideration on the ground that the mother was not competent to testify as to the absence of Gallentine Kinder.

There may be and doubtless are cases in which it would appear to be unseemly and scandalous for the parent to testify to nonaccess at the time of conception. In our opinion the so-called Lord Mansfield rule is artificial and unsound. Being so, it should neither be used to suppress the truth nor to prevent substantial justice.

In *Nolting v. Holt*, 113 Kan. 495, 215 Pac. 281, it was said in the opinion:

"Under all the authorities the presumption of legitimacy may be overcome by proof. . . . When all the ends which the presumption of legitimacy is designed to conserve have been defeated by sordid facts, the courts must deal with the situation in a common-sense way. The statute grants to an illegitimate child inheritance from its father. Its mother knows who the father was. Her evidence is the best evidence, and justice to the child requires that she be a competent witness to its paternity."

The judgment is reversed and the cause remanded with instructions to render judgment for the appellant.

JOHNSTON, C. J., BURCH and HARVEY, JJ., dissenting.