## MOORE v. SMITH.

(Division A. Feb. 8, 1937.)

[172 So. 317. No. 32538.]

W. U. Corley, of Collins, for appellant.

**Smith, C. J.,** delivered the opinion of the court.

This is a filiation proceeding under section 179 et seq., Code of 1930, in which the appellant is attempting to charge the appellee with the support of her child, of which she alleges he is the father. The court below excluded practically all the evidence offered by the appellant as and when offered, and when she rested her case directed the jury, at the request of the appellee, to return a verdict for him, and there was a verdict and judgment accordingly.

The appellant and Clyde Speed were lawfully married

on the 3d day of June, 1928, and were divorced by a decree of the chancery court of Covington county on the 23d day of October, 1934. The child was born on the 26th day of March, 1935, at which time the appellant was a single woman within the meaning of section 179 of the statute, which provides that "when any single woman shall be delivered of a bastard," etc., Crum v. Brock, 136 Miss. 858, 101 So. 704.

A child born during wedlock is presumed to have been begotten by the husband, which presumption continues until the husband is shown to have been incapable of procreation, or to have had no opportunity of access to the wife when the child was begotten. Herring v. Goodson, 43 Miss. 392. The same rule applies where the child is born after the dissolution of the bonds of matrimony, "unless not born within a competent time after the date of the divorce." 7 C. J. 942. This presumption of legitimacy applies here; for the child must have been begotton during the wedlock of the appellant and Speed.

The appellant introduced her mother who testified, without objection, to the nonaccess of Speed to the appellant when the child was begotten. She then sought, but was not permitted, to prove the same fact by the testimony of herself and Speed; specifically, that they separated in 1928, the appellant remaining in Mississippi and Speed removing to Louisiana, where each has continuously remained, thereby rendering access between them impossible.

The narrow question thus presented, and to which this opinion will be confined, is: May husband or wife, in a case where the paternity of a child begotten of the wife during wedlock is in issue, testify to facts disclosing that the husband was so separated from the wife by time and space that he could not have had access to her when the child was begotten?

Prior to 1777, husband and wife were permitted to so testify on such an issue. Rex v. Reading, Ca. temp.

Hard. 79, 95 Eng. Rep. (Reprint) p. 49; 4 Wigmore on Ev. (2 Ed.), 2063.

In Goodright v. Moss, 2 Cowp. 591, 11 Eng. Rul. Cas. 518, decided in 1777, an ejectment case, wherein "the only question in the cause was, whether the lessor of the plaintiff was the legitimate son of Francis and Mary Stevens, or was born of Mary before their marriage," evidence as "to general declarations by the father and mother, that Samuel, the lessor of the plaintiff, was born before marriage," was offered, but was excluded by the trial court. Counsel for the appellant argued "that though the testimony of parents in their lifetime, or their declarations after their decease, might be admissible in cases where proof of the marriage was presumptive only, as by cohabitation, or general reputation; yet neither their declarations, nor their personal testimony could be admitted to bastardize their issue; where, as in this case, the fact of the marriage was actually proved." Lord Mansfield, in responding to this argument, said: "All the cases cited are cases relative to children born in wedlock; and the law of England is clear, that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage. But here the evidence offered is only to prove the time when the issue was born; and to show whether it was before the marriage or after. The objection that is made to it goes a great way indeed; for it goes to this: that even if the father and mother were alive, their own testimony could not have been received. . . . As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule, founded in decency, morality, and policy, that they shall not be permitted to say after marriage that they have had no connection, and therefore that the offspring is spurious; more especially the mother, who is the offending party. . . . But the question of access or non-access is totally different from giving evidence of the time of the birth." All that was there said other than

as to the competency of the mother and father to prove the time of the child's birth was beyond the necessities of the case, and, at most, was dicta judicial in character, and as said by Lord Sumner in Russell v. Russell, [1924] A. C. 687, 13 B. R. C. 246, was "only mentioned for the purpose of saying that it did not apply in the case before him (Lord Mansfield)." Nevertheless, the weight of Lord Mansfield's great name caused it, though with many protests, to be accepted by the English, and a number of the American courts. It has been severely criticized, however, by eminent judges, e. g., Lords Sumner and Carson in Russell v. Russell, supra, and by no less an authority than Dean Wigmore, op. cit., sections 2063, 2064, and has recently been repudiated by the Supreme Court of Kansas in Lynch v. Rosenberger, 121 Kan. 601, 249 P. 682, 684, 60 A. L. R. 376, and the Court of Errors and Appeals of New Jersey in Loudon v. Loudon, 114 N. J. Eq. 242, 168 A. 840. See, also, reviews of Russell v. Russell, supra, in 24 Col. L. Rev. 430, and 40 Harvard L. Rev. 141.

As the question is res nova with us and no statute controls, whether we shall adopt this rule must be determined, not from the fact that it had been recognized and applied by courts of other jurisdictions, but by whether the grounds on which it is said to rest so justify the exclusion of the evidence that its exclusion will not lead to an unrighteous judgment. Rules of evidence derive from two sources, (1) statutes, and (2) the courts themselves. We are concerned here only with the latter. "The rules of Admissibility of evidence . . . fall into three general groups: first, those which determine the probative value, or Relevancy, of circumstantial and testimonial evidence,—that is, the fundamental quality without which no evidential data are to be allowed to be considered by the jury . . .; secondly, those Auxiliary Rules of Probative Policy which impose artificially some added conditions of admissibility, but are directed solely to improving the quality of proof and

strengthening the probabilities of ascertaining the truth as the result of the investigation . . .; and, thirdly, the present group,—those rules which rest on no purpose of improving the search after truth, but on the desire to yield to requirements of Extrinsic Policy. They forbid the admission of various sorts of evidence because some consideration extrinsic to the investigation of truth is regarded as more important and overpowering. The rules of this last class thus differ from those of the second class, in that their effect is to obstruct, not to facilitate, the search for truth, and in that this effect is consciously accepted as less harmful, on the whole, than the extrinsic disadvantages which would ensue to other interests of society if no such limitations existed. It ought to follow that no limitation of the present nature ought to be recognized unless it is clearly demanded by some specific important extrinsic policy, and that every intendment should be made against such a demand.'' Wigmore, op. cit., section 2175; Greenleaf on Evidence (16 Ed.), vol. 3, section 236.

Lord Mansfield's rule, or rather dictum, here in question falls within Dean Wigmore's third group of such rules. The evidence here under consideration is relevant and comes from persons who best know the truth of the matter under consideration, i. e., whether they had opportunity for access to each other at the time the child was begotten. The exclusion of this evidence therefore would obstruct and not facilitate the search for truth. It should therefore be admitted unless its exclusion is clearly demanded by some specific important extrinsic policy, against which ''every intendment should be made.''

The reason given by Lord Mansfield for the exclusion of evidence of this character is that ''decency, morality and policy'' require that husband and wife ''shall not be permitted to say after marriage that they have had no connection, and therefore that the offspring is

spurious." That evidence discloses indecent and immoral conduct is never, of itself alone, a reason for excluding evidence, so that Lord Mansfield's pronouncement has been interpreted by the English courts to mean that "a deeply seated domestic and social policy rendered it unbecoming and indecorous that evidence should be received from such a source, upon such an issue, and with such a possible result," i. e., destroy the child's legal status. Russell v. Russell, supra (a divorce case wherein the rule was discussed and applied). In Tioga County v. South Creek Township, 75 Pa. 433, the court said: "Many reasons have been given for this rule. Prominent among them is the idea that the admission of such testimony would be unseemly and scandalous, and this not so much from the fact, that it reveals immoral conduct upon part of the parents, as because of the effect it may have upon the child, who is in no fault, but who must nevertheless be the chief sufferer thereby. That the parents should be permitted to bastardize the child, is a proposition which shocks our sense of right and decency." To the same effect, see Melvin v. Melvin, 58 N. H. 569, 42 Am. Rep. 605.

Our reaction to Lord Mansfield's reason for the rule, and the interpretation thereof by the courts, is aptly set forth by Dean Wigmore, op. cit., section 2064, as follows: "We learn, then, that the indecency or unseemliness lies in allowing a person to testify to an illicit connection, and that the immorality consists in allowing a parent to give testimony which will ruin his own child's legal status. The utterly artificial and false nature of the rule could not more forcibly appear than in the inconsistency of these 'ex post facto' reasons. (1) There is an indecency, we are told. And yet, in nine cases out of ten, the sole question that the wife is asked is (for example) whether her husband was in St. Louis from 1849 to 1853 during the time that she was in New York. Is this indecent? Moreover, the very next question may be whether during that time she lived with the

alleged adulterer; and this (by general concession) is indubitably allowable. In every sort of action whatever, a wife may testify to adultery or a single woman to illicit intercourse; yet the one fact singled out as 'indecent' is the fact of non-access on the part of a husband. Such an inconsistency is obviously untenable. (2) There is an immorality and a scandal, we are told, in allowing married parents to bastardize their children. And yet they may lawfully commit this same immorality by any sort of testimony whatever, except to the fact of non-access. They may testify that there was no marriage-ceremony, or that the child was born before marriage, or that the one party was already married to a third person, or their hearsay declarations (after death) to illegitimacy in general may be used. In all these other ways they may lawfully do the mean act of helping to bastardize their own children born after marriage. Where is the consistency here? Of what value is this conjuring phrase about 'bastardizing the issue,' if it will not do the trick more than once in a dozen times? . . . The truth is that these high-sounding 'decencies' and 'moralities' are mere pharisaical afterthoughts, invented to explain an otherwise incomprehensible rule, and having no support in the established facts and policies of our law. There never was any true precedent for the rule; and there is just as little reason of policy to maintain it." With this we are in thorough accord.

In Lynch v. Rosenberger, supra, the court said: "In our opinion, the so-called Lord Mansfield rule is artificial and unsound. Being so, it should neither be used to suppress the truth nor to prevent substantial justice." See, also, Com. v. Stricker, decided by a Pennsylvania nisi prius court, and reported in 1 Brown, Appendix xlvii, 1 (50).

The courts excluding this evidence generally base their rule therefor on an assumed right of the child not to be bastardized by the evidence of its presumptive parents, and have permitted this assumed right of the child

to prevail over, usually without referring to, the undoubted right of a husband to disown a child begotten of the wife during wedlock of which he is not the father. The hardship and cruelty of excluding the father's testimony of his nonaccess to his wife will appear when we remember that he best knows where he was when the child was begotten, and his evidence thereof may be all that is available to him, in which event he could not legally disclaim the paternity of the child and relieve himself of the obligation to acknowledge and support it. See, in this connection, Lord Sumner's illuminating opinion in Russell v. Russell, supra, wherein, among other things, he said: "It (Lord Mansfield's rule) is of ancient origin, the product of conditions no longer clearly known, and of social necessities no longer existing in the form in which they arose. The reasons for it have been variously stated, and have never been clear."

Another reason given for the exclusion of this evidence, because of the high source from which it comes, should not be overlooked. In the Poulett Peerage Case, [1903] A. C. 395, Lord Halsbury said that the rule for the exclusion thereof "most wisely and properly protects the sanctity of married intercourse and permits it not to be inquired into in any Court of law;" and that it "protects the sanctity of the matrimonial relation" —"married intercourse" and "matrimonal relation" being here used as meaning the same thing. The matrimonial relation is sacred, but is not sacrosanct. The rule generally is that it can, and justice ofttimes requires that it be, invaded, and its secrets laid bare, e. g., in divorce and criminal cases. But is the matrimonial relation invaded by the admission of evidence, not of what occurred by virtue thereof, but of what did not occur, and under the circumstances could not have occurred, by virtue thereof? The, to us obvious, answer thereto is that this relation would not be invaded, but, on the contrary, would be protected, thereby. To hold otherwise

would protect an unfaithful wife, and also her paramour, both of whom had grossly violated the matrimonial relation; would close the mouth of the injured husband, and force him to remain tied to an unfaithful wife, and to acknowledge and support a child which is not, in fact, his. To adopt a rule causing such a result, under the guise of protecting the matrimonial relation, would press that relation to the breaking point, and the maxim, "nothing too much," applies everywhere and always. That protection of the matrimonial relation is not the basis on which the exclusion of the evidence here in question rests is demonstrated when we remember that husband and wife are competent witnesses to the fact of their nonaccess when the legitimacy of a child is not in issue, e. g., where the wife became pregnant and suffered a miscarriage. Fosdike v. Fosdike (Eng.), 132 Law T. (N. S.) 672, and where the child was stillborn, Holland v. Holland (Eng.), L. R. (1925), Prob. Div. 101.

The straits to which the courts have been driven in finding a satisfactory basis for excluding this evidence is illustrated by dicta that its exclusion (1) prevents the disastrous consequence that would follow the unsettling of title to property, and (2) the branding of legitimate children as illegitimate, Melvin v. Melvin, supra; (3) lessens the number of public charges which would have to be cared for and supported by the public, and (4) works for the peace and quiet of the family and for the peace of the community and society generally. In re Wright's Estate, 237 Mich. 375, 211 N. W. 746. Titles to property may be always unsettled when they depend on the legitimacy of a claimant to the property by proving the claimant to be illegitimate, and no good reason is perceived why, on such an issue, evidence of illegitimacy should not be given by the persons who best know the facts relative thereto. Moreover, human rights—rights that inhere in human beings as such—are of more value and should be given preference over mere property rights. To say that such evidence may brand

a legitimate child as illegitimate merely begs the question, for the legitimacy vel non of the child is the question at issue, a fact that can always be inquired into. Nor does the fact that the public may be called on to support an illegitimate child justify the exclusion of evidence bearing on the legitimacy vel non of the child, that is otherwise admissible and comes from the best source. The peace and quiet of the family seems but another way of saying that the matrimonial relation should be protected, with which we have hereinbefore dealt. Exactly how the peace of the community and society generally would be protected by excluding this evidence is not apparent. On the contrary, it would seem to be best protected by admitting any otherwise competent evidence that would relieve an innocent husband from remaining tied to an unfaithful wife, and being charged with the care and support of a child of which he is not the father.

We conclude, therefore, that domestic and social policy does not require the exclusion of the evidence here under consideration, and that justice would be best promoted by admitting it; consequently, the court below erred in excluding it.

The appellant also sought, but was not permitted, to prove by herself and by the appellee that the latter is the father of the child; and, also, by two other witnesses, that the appellee admitted to them that such is the fact. This evidence should have been admitted. The evidence of the wife as to acts of intercourse with the alleged father of the child whose paternity is in question is universally held competent, as is also such evidence of the alleged father himself, the restriction thereon being that it proves nothing in the absence of evidence of nonaccess of the husband to the wife. Here in addition to the evidence excluded there was evidence by the appellant's mother that Speed had no access to the appellant during the required period.

Reversed and remanded.