JENNIE MARY VENTRESCO
*vs.*
FRANKLIN BUSHEY

Somerset.   Opinion, May 28, 1963.

*Carl R. Wright,* for Plaintiff.

*Thomas J. Guilfoyle,* for Defendant.

SITTING:   WILLIAMSON, C. J., WEBBER, SULLIVAN, JJ. DUBORD, J., sat at argument but retired before rendition of decision.   TAPLEY and SIDDALL, JJ., dissenting.

WEBBER, J.   By her complaint in bastardy the plaintiff accuses the defendant of being the father of her child alleged to have been begotten on or about April 22, 1960. The defendant has filed his motion for summary judgment

which is now reported for our determination upon the pleadings and an agreed statement of facts. The facts agreed upon are as follows:

"It is stipulated and agreed by counsel of both parties hereto that one Jennie Mary Allain, the Plaintiff in this Complaint, and one Ernest Alfred Allain were married on July 25, 1959 in Madison, Maine; that since August, 1959, to date, said Ernest Alfred Allain has been continuously stationed as a member of the armed forces outside the territorial limits of the United States, to wit in England; that since August, 1959, to date, said Jennie Mary Allain has been continuously within the territorial limits of the United States, to wit in the State of Maine; that said Jennie Mary Allain, the Plaintiff in this Complaint, filed a Complaint for Divorce dated February 2, 1960 against said Ernest Alfred Allain; that a divorce from the bonds of matrimony was granted Jennie Mary Allain, the Plaintiff in this Complaint, against Ernest Alfred Allain on June 9, 1960, by the Presiding Justice of the Somerset County Superior Court, and that in said decree said Jennie Mary Allain had her name changed to Jennie Mary Ventresco; that Jennie Mary Ventresco and Jennie Mary Allain are one and the same person; that on January 22, 1961 Dwayne Anthony Ventresco, a son, was born alive in Skowhegan, Maine, said Jennie Mary Ventresco being the mother thereof, and that said child was conceived during the time the said Jennie Mary Allain was married to the said Ernest Alfred Allain; that said conception was not the result of artificial insemination."

It may be seen at once that the child was conceived at a time when the complainant was a married woman but so separated from her husband as to render it impossible for him to have been the father of her child.

The defendant asks that we adopt what may be termed the Florida rule and hold that the complainant may not

institute filiation proceedings under these circumstances. In 1955 the New Jersey court had occasion to interpret the law of Florida pertinent to this issue. *Kowalski* v. *Wojtkowski,* 19 N. J. 247, 116 A (2nd) 6. A divided court concluded that a child, conceived while the mother was married but born after her divorce was granted, must be conclusively presumed to be legitimate under the common law of Florida in any proceeding instituted by the mother. The court was satisfied that in Florida the mother cannot illegitimate her child conceived or born during wedlock but the husband or reputed father is not subject to such disability. Mr. Justice Brennan, dissenting, carefully reviewed the authorities and concluded that the presumption is not conclusive under the common law of any jurisdiction including Florida. But in 1960 the District Court of Appeal in Florida confirmed the judgment of the New Jersey court by holding unequivocally that a mother is not permitted to have a child which has been conceived in wedlock declared to be illegitimate. *Sanders* v. *Yancey* (1960), 122 So. (2nd) (Fla. Dist. Ct. App.) 202; *Illgen* v. *Carter* (1960), 123 So. (2nd) (Fla. Dist. Ct. App.) 368. See *Gossett* v. *Ullendorff* (1934), 114 Fla. 159, 154 So. 177. Although expressions used by courts in a few instances may tend to raise some doubt as to what rule might be followed if the issue were squarely presented, it is our impression that the Florida rule has not been adopted elsewhere unless by statutes with which we are not here concerned. See Annot. 53 A. L. R. (2nd) 572, 580.

In Maine the statute gives standing to institute bastardy proceedings to "a woman pregnant with a child, which, if born alive, may be a bastard, or who has been delivered of a bastard child." R. S., Chap. 166, Sec. 23. Although a married woman in Maine has been subject to a testimonial restriction with respect to the non-access of her husband, her standing to institute bastardy proceedings has not been

questioned. *Hubert* v. *Cloutier,* 135 Me. 230. The presumption is not conclusive. See *Mitchell* v. *Mitchell,* 136 Me. 406. The leading case of *In Re Findlay* (1930), 253 N. Y. 1, 170 N. E. 471, holding that the presumption is rebuttable, stated the law which obtains in almost all jurisdictions. We are therefore satisfied that this complainant is not precluded from instituting a bastardy complaint. Since this is the only ground advanced by the defendant in support of his motion for summary judgment we could perhaps deny the motion without further discussion, but issues are presented by the agreed statement which will certainly affect the course of litigation and which should properly be here considered and resolved.

As already noted, the stipulation of the parties recites facts which conclusively demonstrate that it was physically impossible for the former husband of the complainant to have been the father of the child involved in these proceedings. Yet that stipulation is in part the statement of the complainant and if she is legally barred from testifying as to facts tending to prove non-access by her husband, it could be asserted with some force that the agreed statement cannot properly be received. This brings us directly to a reconsideration of the testimonial restriction imposed by *Hubert* v. *Cloutier,* 135 Me. 230 (cited *supra*). After holding that the presumption of legitimacy, although "one of the strongest and most persuasive known to the law," can nevertheless be rebutted, the court turned to a consideration of the required proof of non-access by the husband. The court said at page 231: "In 1777, Lord Mansfield laid down the rule in England that the testimony of neither husband nor wife could be admitted to show non-access by the husband, if the result would be to bastardize issue born after marriage. 'It is,' he said, 'a rule founded in decency, morality, and policy.' * * * This doctrine has since been followed in England and by the vast majority

of courts in this country." After noting that the Mansfield rule has been criticized by Dean Wigmore, but without discussion of the reasons therefor, the court concluded that "by and large the enforcement of it is politic." The court added: "The application of it prevents many unseemly contests over the legitimacy of children, and tends to keep inviolate those marital confidences, the disclosures of which arouse only disturbing suspicion and prove nothing." Since the application of the rule in the instant case obviously results in the suppression of the truth and the working of a manifest injustice, we feel compelled to reexamine the rule, its origin and the reasons advanced for its support, in order to determine whether it should be continued in effect.

Wigmore, 3d Ed., Vol. VII, Secs. 2063 and 2064, fully sets forth the historical origin and development of the rule. Until 1777 the common law had required only that in filiation proceedings the uncorroborated testimony of a married woman would not suffice to charge a respondent with paternal responsibility. The restriction stemmed from the interest of the husband in the outcome since a favorable result would relieve him of support. In 1777 the Mansfield utterance was offered gratuitously and unnecessarily as a dictum in an action of ejectment. It was so stated, however, as to be applicable in all cases and, as already noted, it contained the now famous and oft quoted vindicating phrase, "decency, morality and policy." Wigmore carefully examines the validity of these criteria and points out manifest inconsistencies. While it is termed indecent for the wife to testify that her husband lived for four years in St. Louis while she resided in New York as proof of the impossibility of access, no indecency is discovered in admitting her testimony that she lived in adultery with a third party for four years. Dean Wigmore's summation states: "The truth is that these high sounding 'decencies'

and 'moralities' are mere pharisaical afterthoughts, invented to explain a rule otherwise incomprehensible, and lacking support in the established facts and policies of our law. There never was any true precedent for the rule: and there is just as little reason of policy to maintain it."

Our review of the authorities suggests that although a majority has adhered to the rule, those courts which have subjected it to critical examination and taken account of the unjust results which flow from it have rejected it for most persuasive reasons. In the leading case of *Moore* v. *Smith* (1937), 178 Miss. 383, 172 So. 317, the issue was whether or not the husband or wife could testify to facts disclosing that they were so separated by time and space that he could not have had access to her when the child was begotten. After analyzing carefully the Mansfield dictum, the court concluded that the importance of the search for truth clearly outweighed any policy considerations here present—and that in fact and in truth decency, morality and justice would be best served by admitting the evidence. In reliance upon the reasoning in *Moore,* the Colorado court repudiated the Mansfield dictum. *Vasquez* v. *Esquibel* (1959), 346 P. (2nd) (Colo.) 293; see *Nulman* v. *Cooper* (1949), 120 Colo. 98, 207 P. (2nd) 814. In a vigorous and persuasive dissenting opinion in *State* v. *Sargent* (1955), 118 A. (2nd) (N. H.) 596, 599, Kenison, C. J. noted that the wife and mother is the person most likely to know the truth, that no modern text supports the Mansfield dictum, that McCormick on Evidence (1954) Sec. 67 terms the rule an "eccentric incompetency" which some courts have "wisely rejected," and that the Uniform Reciprocal Enforcement of Support Law provides a contrary rule. The New Jersey court in *Loudon* v. *Loudon* (1933), 168 A. (N. J.) 840, 841, a divorce action, repudiating the Mansfield dictum, expressed its preference for a rule "founded on truth, reason and justice." The court continued: "A

rule of law which has existed in our mother country for over 150 years and has been adopted and followed in so many of our sister states would ordinarily strongly recommend itself for our favorable consideration. But the fact that the rule is based on a foundation that is unsound and leads to the suppression of the truth and the defeat of justice takes from it the customary traditional and precedential justification urging its adoption. * * * A law which compels such a conclusion (Against what seems to be the truth) is not only impotent and embarrassing, but is a law which, despite its tradition and universality, was never justified and should not be followed." In *Lynch* v. *Rosenberger* (1926), 121 Kan. 601, 249 P. 682, with respect to the right of the wife to testify to non-access, the court reasoned that the very essence of evidence is to "make clear or ascertain the truth" and asserted that "the best obtainable evidence should be adduced." Dean Wigmore's critique was quoted at length and with evident approval. Although doubt was cast on the position of the Kansas court in *Martin* v. *Stillie* (1929), 129 Kan. 19, 281 P. 925, a dictum in *Bariuan* v. *Bariuan* (1960), 186 Kan. 605, 352 P. (2nd) 29, leads us to conclude that *Lynch* reflects the present attitude of the Kansas court toward the Mansfield dictum. Reaching like results are *Yerian* v. *Brinker* (1941), 35 N. E. (2nd) (Ohio Ct. App.) 878; *Peters* v. *Dist. of Columbia* (1951), 84 A. (2nd) (D. C.) 115; *Murphy* v. *Dist. of Columbia* (1952), 85 A (2nd) (D. C.) 805; *In Re McNamara's Est.* (1919), 181 Cal. 82, 183 P. 552; *Mathews* v. *Hornbeck* (1927) 80 Cal. App. 704, 252 P. 667. Although the Minnesota court construed a statute as permitting the wife to testify to non-access by her husband, it indicated by dictum its approval of the Wigmore condemnation of the Mansfield rule. *State* v. *Soyka* (1930), 181 Minn. 533, 233 N. W. 300.

Under some circumstances courts which adhered to the Mansfield dictum have been compelled to reach results which were inconsistent with the reasons given as the basis for the rule. In *Monahan v. Monahan,* 142 Me. 72, a divorce was sought on the ground of adultery. The only evidence of adultery came in the form of an admission by the wife to witnesses that her child was a bastard. The court held that the evidence could properly be received since the issue was adultery and not illegitimacy. Yet as a practical matter the status of the child was involved since no court would be likely to order the husband to make support payments for the child on such evidence. The court said in effect that proof that a wife has given birth to a bastard child is alone sufficient to prove her adultery even though it cannot prove that the child is a bastard. It seems quite unnecessary to resort to absurd and illogical reasoning in order to preserve an arbitrary rule of law which never had a logical foundation in the first place. Certainly if "decency, morality and policy" afford reason for the bar under any circumstances, they should with equal force bar the testimony admitted in *Monahan.*

In Massachusetts by statute a married woman is competent to testify in a bastardy proceeding as to "relevant matters, including * * * the parentage of the child." *Commonwealth* v. *Kitchen* (1937), 299 Mass. 7, 11 N. E. (2nd) 482. Yet the court in the absence of statute would adhere to the Mansfield dictum under some circumstances. Nevertheless, as in *Monahan* v. *Monahan, supra,* the court would permit a witness to relate the admission of a wife that her husband was not the father of her child where the issue was her adultery. *Sayles* v. *Sayles* (1948), 323 Mass. 66, 80 N. E. (2nd) 21.

In a bastardy proceeding brought in Illinois by a married woman, the husband was permitted to testify as to non-access. Holding this to be error in accordance with

the Mansfield dictum, the court noted that although the wife by statute may testify to non-access, the husband is yet barred by the common law rule. The court argued in support of its holding that the husband might otherwise be relieved of the support of the child and that burden would then fall upon the public. *People* v. *Dile* (1931), 347 Ill. 23, 179 N. E. 93. We are not persuaded that the public treasury should be protected by foisting upon a husband the support of a child obviously not his own.

In *Kennedy* v. *State* (1915), 117 Ark. 113, 173 S. W. 842, the court after reciting nearly all of the reasons commonly advanced for adherence to the Mansfield dictum, nevertheless concluded that the wife could properly have testified to facts tending to prove that access by her husband at all material times was impossible. The court apparently would limit the application of the Mansfield restriction to her direct testimony that her husband did not in fact have access. We fail to perceive how "decency, morality and policy" are satisfied in the one case and not in the other. Nor do we perceive how the child is greatly benefited by a rule which affords him protection from the tragic truth in one case but not in the other.

We are satisfied that the devastating criticism by Dean Wigmore finds ample support when one examines the results of adherence to it. The manifest inconsistencies which have defied resolution by those courts which have thus far followed the rule demonstrate fully that it has persisted overlong. We do not lightly cast aside a rule of evidence which has never before been challenged by our court. But in the face of facts such as are apparent in the instant case where blind adherence to an illogical doctrine can result in the "suppression of the truth and the defeat of justice," we are constrained to reconsider and abolish the rule. We now hold that both husband and wife may testify both as to his non-access to her and as to facts

which tend to prove that access was impossible. To the extent that *Hubert* v. *Cloutier*, 135 Me. 230, stands for a contrary result, it is hereby overruled. It naturally follows that the agreed statement in the instant case which substitutes both for the testimony of the complainant and the admission of the respondent as to the essential fact of non-access by the husband may properly be received in evidence.

This opinion should not be concluded without some reference to the quality and quantum of proof required to dissipate the presumption of legitimacy. It is, as we have noted, a disputable presumption. We held in *Hinds* v. *John Hancock Ins. Co.*, 155 Me. 349, 364, that such presumptions are not themselves evidence but serve the procedural purpose of shifting the burden of going forward with evidence. They persist "until the contrary evidence persuades the fact finder that the balance of probabilities is in equilibrium." They then disappear and serve no further purpose. The presumption of legitimacy because of its great strength as a matter of policy has always been considered as requiring special treatment. It is no ordinary presumption. Courts have employed many phrases in assessing the requirements to be met by the party who is faced with the necessity of proving illegitimacy. It has often been said that the evidence must be "clear and convincing," and even "conclusive." Mr. Justice Cardozo in *In Re Findlay* (1930), 253 N. Y. 1, 170 N. E. 471 (cited *supra*), said that the presumption would not fail "unless common sense and reason are outraged by a holding that it abides." This phrase was quoted with approval in *Parker et al., Applts.*, 137 Me. 80, 82. In *Re Jones* (1939), 8 A (2nd) (Vt.) 631, the court likened this presumption to the presumption of innocence and concluded that it was accompanied by a substantive rule of law fixing the quantum of proof necessary to prove illegitimacy, i.e. beyond a

reasonable doubt. Other courts have determined that proof beyond a reasonable doubt is required. *Commonwealth* v. *Kitchen* (1937), 299 Mass. 7, 11 N. E. (2nd) 482 (cited *supra*) ; *Estate of McNamara* (1919), 181 Cal. 82, 183 P. 552 (cited *supra*) ; cf. *In Re Rogers' Estate* (1954), 30 N. J. Super. 479, 105 A. (2nd) 28, 31. Wisconsin has fixed this quantum of proof by statute. *In Re Aronson* (1953), 263 Wis. 604, 58 N. W. (2nd) 553. A writer in 33 H. L. Rev. 306, 308, suggests that proof beyond a reasonable doubt is the desirable quantum. "It is believed that this test is the most desirable one, for it not only carries out the policy of the law, but also provides a standard with the use of which the courts are familiar. Its universal adoption would make for simplification and certainty in an important social matter." The writer of the article is in accord with the Vermont court in suggesting that there is present not merely an ordinary disputable presumption but a substantive rule of law fixing the burden of proof upon one who would attack legitimacy. We are satisfied that the adoption of this evidentiary requirement will afford proper protection to children whose legitimacy is attacked and will provide a definable quantum of proof which is familiar to both Bench and Bar.

The entry will be

> *Motion for Summary Judgment denied. Case remanded for further proceedings in accordance with this opinion.*

TAPLEY, J. DISSENTING OPINION

The majority opinion of this court has now declared that the presumption of legitimacy may be rebutted by the declarations, admissions or testimony of the mother as to

the non-access of her husband, therefore making it legally possible for the mother (in this case) to bastardize her own child. The majority of the court speaks in the following language:

> "We do not lightly cast aside a rule of evidence which has never before been challenged by our court. But in the face of facts such as are apparent in the instant case where blind adherence to an illogical doctrine can result only in the 'suppression of the truth and the defeat of justice,' we are constrained to reconsider and abolish the rule. We now hold that both husband and wife may testify both as to his non-access to her and as to facts which tend to prove that access was impossible."

This plaintiff, whose husband was serving in the armed forces outside the territorial limits of the United States, became pregnant with child and in a bastardy action charged the defendant, Franklin Bushey, with being the father of the child. She entered into an agreed statement of facts, the effect of which was to rebut the presumption of legitimacy and thereby bastardize her own child. This court has now said, by abolishing the Lord Mansfield Rule, that she legally may do so. I do not agree with this decision.

The weight of authority stands on the side of the Lord Mansfield Rule.

> "The rule first laid down by Lord Mansfield that on grounds of public policy neither husband nor wife should be permitted to bastardize a child born in lawful wedlock by testifying to their own non-access with one another has been criticized by eminent authority, and has been expressly repudiated by at least one court, (n) but, in the absence of a statute to the contrary, is none the less established law in most jurisdictions - - - ." (n) *Loudon* v. *Loudon,* 168 A. 840 (N. J.) 97 C. J. S.— Witnesses—Sec. 90 (a).

Many of the decisions of the appellate courts state sound reasons why the Rule is important to a well regulated society and therefore should be retained.

The reasoning of the Massachusetts Supreme Court is persuasive:

> "The rule has been based on reasons of decency and policy, especially because of the effect it may have upon the child, who is in no fault. The policy of the rule has been severely criticized. See Wigmore on Ev. Secs. 2063, 2064. But it has been too long settled in this commonwealth to be changed by judicial decision.
>
> - - - - - - -
>
> "The libellee contends that to admit the evidence of her statement to the probation officer would be a circumvention of the Lord Mansfield rule. This we do not accept. The rule, where applicable, relates to the competency of a husband and a wife as witnesses as to nonaccess, and never has served to prevent the introduction of such evidence through other witnesses. Whatever its intrinsic soundness, it should not operate in a case to which a wife is a party to exclude her admission of extramarital intercourse. In England, where the rule originated, and where it has relatively recently been affirmed by a divided decision of the House of Lords (Russell v. Russell, (1942), A. C. 687), the libellee's admission in the present case would be received to prove adultery, but not to prove the illegitimacy of the offspring. - - - - - Our conclusion has the fullest support from a recent decision of the Supreme Judicial Court of Maine. Monahan v. Monahan, Me., 46 A. 2d 706." *Sayles* v. *Sayles,* 80 N. E. (2nd) 21, 22, 23 (Mass.).

The late Justice Thaxter, a former learned and scholarly member of this court, who wrote the opinion in *Hubert* v. *Cloutier,* 135 Me. 230, 231, 232, observed with sound reasoning as follows:

"The complainant at the time the child was conceived and born was a married woman; and the presumption is that such child born during wedlock is the child of her husband and legitimate. In early times in England such presumption was held to be conclusive, if the wife had issue while the husband, not being impotent, was within the four seas, that is, within the jurisdiction of the King of England. Co. Litt., 244; Rolle's Abr., 358, tit. Bastard; Matter of Findlay, 253 N. Y., 1, 170 N. E., 471, 472; 7 Am. Jur., 636. The rigor of such doctrine has now given way to reason; and it is held that such presumption can be rebutted. It is, nevertheless, as Cardozo, Ch. J. says in Matter of Findlay, supra, 'one of the strongest and most persuasive known to the law' and 'will not fail unless common sense and reason are outraged by a holding that it abides.' Proof of the mother's adultery is not in itself sufficient to rebut it. - - - - -

"In the case now before us it was accordingly necessary for the complainant to prove non-access by her husband. The only evidence of any weight on this point is her own testimony to the effect that she and her husband had not lived together for two years. Without such evidence her case would fall. The respondent objected to its introduction. We think his objection was well taken.

"In 1777, Lord Mansfield laid down the rule in England that the testimony of neither husband nor wife could be admitted to show non-access by the husband, if the result would be to bastardize issue born after marriage. 'It is,' he said, 'a rule founded in decency, morality, and policy.' Goodright, ex dem. Stevens v. Moss, Cowp., 591. This doctrine has since been followed in England and by the vast majority of courts in this country. - - - - -

"The rule which we feel must be applied to this case has been criticized by very eminent authority. 4 Wigmore on Evidence, 2 ed., 381, et seq. It was,

however, promulgated by Lord Mansfield, a very great and an essentially practical judge. It has been followed because it has appealed to the sober common sense of subsequent generations. Cases may be cited, real or suppositious, where it may work a hardship. The question, however, is not what may be the bearing of the rule on a particular problem, but whether by and large the enforcement of it is politic. The application of it prevents many unseemly contests over the legitimacy of children, and tends to keep inviolate those marital confidences, the disclosures of which arouse only disturbing suspicion and prove nothing."

In Pennsylvania, *In Re Finks Estate,* 21 A (2nd), 883-889, the court said:

"It has become part of the substantive law of evidence in this state that the proofs necessary to rebut a presumption of legitimacy must be of the highest order - - - -. In fact, in pursuit of a well established public policy, we have gone so far as to hold consistently that non-access cannot be testified to by either husband or wife in order to overcome the presumption of legitimacy."

The Nebraska Court, in *Zutavern* v. *Zutavern,* 52 N. W. (2nd) 254, 260, had this to say on the subject:

" - - - - that the presumption of legitimacy of a child born in lawful wedlock may not be rebutted by any information, the source of which is either the husband or the wife; and that all testimony of the husband and wife which has a tendency to prove or disprove legitimacy is incompetent. There is no doubt as to the existence of this rule of law. It was proclaimed more than a century ago in England and has been adopted and applied by many courts of this country. It is the rule in Nebraska."

In holding that a husband or wife are incompetent witnesses to rebut the presumption of legitimacy, the Pennsylvania Court reasons thusly:

> "In order to successfully rebut the presumption of legitimacy, the evidence of non-access or lack of sexual intercourse or impotency must be clear, direct, convincing and unanwerable - - - -. Moreover, *our public policy is so firmly established and so strong* that the courts have repeatedly declared that 'non-access cannot be testified to by either the husband or wife in order to overcome the presumption of legitimacy.'" *Cairgle* v. *American Radiator & Standard Sanitary Corp., et al.,* 77 A. (2nd) 439, 442. (Emphasis supplied.)

The Lord Mansfield Rule has been applied for approximately 150 years and no rule of evidentiary law would survive this long unless its purpose was consistent with the sound principles of a good and honorable society. I am mindful of the necessity, in the administration of the law, that under some circumstances long established precedents must be overruled and new ones established in order to satisfy and conform to changed conditions. This I believe to be worthy and proper procedure. According to my view, the abolishment of the Mansfield Rule does not come within this category.

The rule laid down in the majority opinion allows either spouse to testify with reference to non-access. It is applicable to cases in which the husband and wife have resided in the same community as well as to those in which they have been separated by long distances. The evidentiary requirement under the rule set forth in the majority opinion is one of strictness. Nevertheless, the door will be opened to a great variety of legal controversies, characterized by Justice Thaxter in *Hubert* v. *Cloutier, supra,* as "unseemly contests," over the legitimacy of children, which will in a vast majority of cases under those strict evidentiary rules result in no benefit to any litigant, but which will in all cases affect the lives and happiness of innocent children. I feel that the underlying reasons for the rule as set forth

in *Hubert* v. *Cloutier, supra,* are as convincing today as they were when expressed in that opinion.

Justice Cardozo characterized the presumption as "one of the strongest and most persuasive known to the law." It has been so described by many eminent jurists. There must be, and there is, sound reasoning and support behind such a strong presumption.

There is much in the presumption of legitimacy that sustains the dignity of the person and tends to preserve and strengthen the moral fiber of society. It should not be allowed to be destroyed by the mother of the child — the child for whom this strong and important presumption was created to protect.

When a mother, as in this case, testifies in a court of law, either as a witness or through the medium of an agreed statement of facts, that her child is a bastard, it does something adversely to the fine and more noble sensibilities of people and to the decency and morality of the community. Such procedure does violence to public policy.

I have given some thought to the argument that if the mother is not permitted to testify that an injustice will be done to her husband. That injustice can be minimized, if not entirely dissipated, by the introduction of evidence other than that of the wife which can be readily obtained, destroying the presumption and thereby testifying to the fact that he is not the father of the child.

For the reasons I have set forth, I am unable to concur with my fellow members of the court and, therefore, respectfully dissent.

Siddall, J., joins in dissent.