Julie ATKINSON

v.

Robert HALL.

Supreme Judicial Court of Maine.

Argued Jan. 19, 1989.
Decided March 31, 1989.

Brian E. Swales, (orally), Houlton, for plaintiff.

Torrey Sylvester, Houlton, for defendant.

Before McKUSICK, C.J., and ROBERTS, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

HORNBY, Justice.

This case concerns the applicability of conflicting presumptions about the paternity of a child born during a marriage. Under the Maine Rules of Evidence, the legitimacy of a child born or conceived during marriage can be challenged only by proof beyond a reasonable doubt. Here, however, the results of blood tests produced a conflicting statutory presumption that the defendant—not the mother's husband—was the father, a presumption that can in turn be rebutted only by clear and convincing evidence. We conclude that no reversible error occurred when the Superior Court (Aroostook County; *Pierson, J.*) put these competing presumptions aside in informing the jury that the mother must prove her paternity case against the defendant by the ordinary standard, a preponderance of the evidence.

The defendant Robert Hall testified that he dated the plaintiff Julie Atkinson off and on from December of 1970 until early October of 1971. In September 1971 they went to Connecticut together. The couple lived in a friend's house while they were in Connecticut and engaged in sexual intercourse at that time. Hall soon returned to Houlton, Maine, because he had a court appearance. Hall testified that he did not see Atkinson after the first of October except on one occasion when she visited him in jail in Maine sometime between the end of October and early December, 1971. He testified that during that visit Atkinson told him that she was going to marry Gerald Marshall and that she was pregnant with Marshall's child. Atkinson, on the other hand, testified that she was pregnant with Hall's child and that she told Hall so when she visited him in jail. Atkinson married Gerald Marshall in January of 1972. The child, Jay, was born July 20, 1972. Jay's name on his birth certificate was Jay Alan Marshall, with his father listed as Gerald Alan Marshall. A certificate of baptism listed Jay's father as Gerald A. Marshall.

Marshall and Atkinson were divorced some five to eight months after Jay's birth. According to Atkinson, the divorce decree required Marshall to pay child support for Jay, but he has made only one payment of $75.00. Atkinson filed a complaint for nonsupport against Marshall in early 1974. Atkinson has received AFDC benefits and has repeatedly used Jay's birth certificate

(showing Marshall as his father) in support of her entitlement. Indeed, she agrees that all legal documentation pertaining to Jay's paternity shows Marshall as his father.

At the time of trial, Hall was 5′8½″ tall, weighed 150 lbs. and wore a size 8½ shoe. Atkinson was 5′4″ tall. Jay, age 15 at trial, testified that he was 6′1″ tall, weighed 170 lbs., and wore a size 14 shoe. There was evidence that Gerald Marshall was heavy and conflicting testimony that he was either 5′11″ or 5′9″. Atkinson testified that other members of her family are 6′ tall.

The results of blood tests submitted to the jury showed the probability of Hall's paternity to be 98.27 percent. No blood test was conducted on Marshall.[1] Atkinson produced birthday cards and photographs from Hall to Jay in which Hall referred to himself as Jay's father or "Dad." Hall testified that he signed the cards and photographs in this fashion because Jay had no father figure in his life and that he did the same thing for his stepchildren by a later marriage.

Atkinson brought her lawsuit in 1986 seeking child support from Hall under Maine's version of the Uniform Paternity Act, 19 M.R.S.A. §§ 271–287 (1981 & Supp. 1988). At trial Atkinson requested a jury instruction that Hall's blood test raised a presumption of paternity in Hall that could be rebutted only by "clear and convincing evidence." 19 M.R.S.A. §§ 280, 280–A. Hall, on the other hand, sought an instruction under M.R.Evid. 302 that because Jay was born to Atkinson while she was lawfully married to Marshall, Atkinson had the burden of "producing evidence" and of "persuading the trier of fact beyond a reasonable doubt" that Jay was not Marshall's son. The Superior Court Justice disregarded both presumptions under M.R.Evid. 301(c) and instructed the jury that Atkinson had the burden of proving her case by a preponderance of the evidence. The jury returned a unanimous verdict for Hall, thus

finding that he was not the father of the child. Atkinson has appealed.

We have some concern whether Maine's paternity statute contemplates an action to establish that the father of a child born during marriage is someone other than its mother's husband. It is true that bastardy proceedings predating the adoption of the statute suggest the possibility of such an action. *See Ventresco v. Bushey*, 159 Me. 241, 191 A.2d 104 (1963) (recognizing such an action where the child was conceived during the marriage but born after a divorce). But in adopting the paternity statute in 1967, the Maine Legislature dealt only with the obligations of "the father of a child which is or may be born out of wedlock" and declared that such a father is liable "to the same extent as the father of a child born in wedlock." 19 M.R.S.A. § 271. The Uniform Act on Paternity, which the Maine statute otherwise closely follows, specifies that "[a] child born out of wedlock includes a child born to a married woman by a man other than her husband." § 1, 9–B U.L.A. 350 (1960). Significantly, the Maine Legislature dropped this sentence entirely in enacting the Maine version. Thus, it is possible that the Maine Legislature intended to limit paternity actions to instances where children were born to an unmarried woman. Because the parties have not addressed this issue and we have been unable to find any legislative history on the subject, we do not decide the question.

◼ Assuming without deciding that a mother whose child was born during marriage may question the legitimacy of that child and bring a paternity action against a man other than her husband, we examine the conflicting presumptions. Because the blood tests showed that the probability of Hall's paternity was 97 percent or higher, the paternity statute provides first that "the alleged father is presumed to be the father, and this evidence must be admitted," 19 M.R.S.A. § 280(1)(D), and second that the presumption may be rebutted only

---

**1.** The Superior Court (Aroostook County; *Pierson, J.*) denied Hall's motion to add Marshall as a defendant, and Hall has not challenged that ruling on appeal. Hall has not argued that the divorce decree between Marshall and Atkinson, which apparently recognized Marshall's paternity, is any kind of bar to this action. *Cf. Odle v. Patrick*, 538 A.2d 770 (Me.1988).

"by clear and convincing evidence." *Id.* § 280–A. Because Atkinson was married to Marshall at the time of Jay's birth, however, M.R.Evid. 302 establishes a different presumption. Specifically,

> [w]henever it is established in an action that a child was born to or conceived by a woman while she was lawfully married, the party asserting the illegitimacy of the child has the burden of producing evidence and the burden of persuading the trier of fact beyond a reasonable doubt of such illegitimacy.

Under the presumption of legitimacy established by this rule, Atkinson has the burden of showing that Jay is *not* Marshall's child by proof beyond a reasonable doubt. These two presumptions directly conflict.

M.R.Evid. 301(c) provides instructions on how to resolve the conflict:

> If two presumptions arise which are conflicting with each other, the court shall apply the presumption which is founded on the weightier considerations of policy and logic. If there is no such preponderance, both presumptions shall be disregarded.

In terms of logic, presuming paternity from a 98.27 percent blood test seems weightier than presuming legitimacy from the mere fact of marriage.[2] In terms of policy, however, there is no particular weight to the blood test presumption (except perhaps to reduce the number of trials), since a jury is able to hear and evaluate the testimony concerning the blood test without the presumption and thus make a rational decision as to who is the biological father in any event. The presumption of legitimacy, on the other hand, is clearly designed to minimize official intrusion into marital and family relations. This Court has consistently stated that the presumption of legitimacy is one of the strongest known to the law, *In Re Estate of Parker,* 137 Me. 80, 82, 15 A.2d 183, 184 (1940), and that it is "no ordinary presumption." *Ventresco v. Bushey,* 159 Me. at 250, 191 A.2d at 109. The fact that the legitimacy pre-

sumption requires proof beyond a reasonable doubt to overcome it, whereas the paternity presumption requires only clear and convincing evidence, may also bear upon their respective weights.

With logic on one side and policy on the other, we are satisfied that at the very least the paternity presumption is not founded on weightier considerations than the legitimacy presumption. Therefore, Atkinson was not prejudiced when the Superior Court instructed the jury to decide this case under the ordinary civil standard of a preponderance of the evidence; if anything, Hall may have been entitled to an instruction on the presumption of legitimacy. Since no party here is arguing that the legitimacy presumption prevails, however, and given our uncertainty whether Atkinson even had a cause of action under Maine's paternity statute, we leave that issue for another day.

The jury heard all the evidence concerning Atkinson's relationship with both Marshall and Hall, and concerning Hall's relationship with Jay; observed Atkinson, Hall and Jay as well as pictures and descriptions of Marshall; and made its decision accordingly. We see no reason to disturb it.

The entry is:

Judgment affirmed.

All concurring.

**2.** For a discussion of the many risks and limitations involved in the use of the percentage figures generated by blood tests, however, *see* Peterson, *A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask),* 22 Santa Clara L.Rev. 667, 677–708 (1982).